705 So.2d 1302 (1998)
John Robert KROICS, et al., Plaintiffs-Appellees,
v.
Sharon R. KROICS, Defendant-Appellant.
No. 97-911.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1998.
*1303 Thomas Willson, Alexandria, for John Roberts Kroics, et al.
Edward Larvadain, Jr., Alexandria, for Sharon R. Kroics.
Before YELVERTON, WOODARD and AMY, JJ.
WOODARD, Judge.
Sharon Kroics, the natural mother of the minor child, Michael Thomas Wade Kroics, appeals the trial court's award of custody to the child's paternal aunt and uncle, John Robert Kroics, and his wife, Pamela Kroics, after the death of the child's natural father, Michael Kroics. Before the natural father's death, Sharon Kroics and Michael Kroics had joint custody of the minor child. For the reasons assigned below, we affirm.

FACTS
From the marriage of Sharon R. Kroics (Sharon) and Michael E. Kroics (Michael), one child by the name of Michael Thomas Wade Kroics (Michael Thomas) was born on November 24, 1990. The parties separated and later divorced in June of 1991. At the time of the divorce, Michael Thomas was seven-months old. After a hearing, the court granted joint custody to Michael and Sharon in a considered decree; Michael was named the domiciliary parent from January 1 through June 30 of each year, and Sharon was designated the domiciliary parent from July 31 to December 31 of each year. The court also decreed that when one parent had custody of the child, the other was to have visitation rights with the child every weekend.
The parties followed visitation, as ordered, for about a year and a half until Sharon entered into an oral agreement with Michael, who lived alone, to have his son live with him during the six months that she was supposed to keep him. At that time, Sharon was eight-months pregnant and was living with her boyfriend, who was unwilling to accommodate Michael Thomas' basic needs. During Michael Thomas' stay with Michael, the child spent a lot of time with his grandmother. Sharon ceased visitation with Michael Thomas when her second child was about a year old.
Michael died of a heart attack in October of 1996. Upon learning of his death, Sharon visited her son, but did not take him home with her. Then, Michael's brother, John Robert Kroics (John) and his wife, Pamela Kroics (Pamela), took their nephew and petitioned the court for permanent custody of the child. After the January 6, 1997 hearing, the trial court granted domiciliary custody to John and Pamela and granted liberal visitation *1304 rights to Sharon. It is from this judgment that Sharon appeals.

ASSIGNMENTS OF ERROR
Sharon asserts that the trial court erred in that it:
1. Modified a considered decree, which decree awarded appellant joint custody of her child without applying the Bergeron v. Bergeron, 492 So.2d 1193 (La. 1986) requirements.
2. Failed to apply the proper standard of proof required by law when a non-parent is in a custody contest with a natural parent.

LAW
A trial court's determination regarding child custody is to be afforded great deference on appeal and will not be disturbed absent a clear abuse of discretion. Hawthorne v. Hawthorne, 96-89 (La.App. 3 Cir. 5/22/96); 676 So.2d 619, writ denied, 96-1650 (La.10/25/96); 681 So.2d 365.

MODIFICATION OF CONSIDERED DECREE
The main issue before this court is which test to apply in examining a change of custody when a trial court has made a considered decree of custody and when the new parties in contest are a parent and a non-parent. A considered decree is one rendered by a court after receiving evidence "as to parental fitness to exercise custody...." Geen v. Geen, 95-984 (La.App. 3 Cir. 12/27/95); 666 So.2d 1192, 1195, writ denied, 96-201 (La.3/22/96); 669 So.2d 1224 (citation omitted).
Sharon contends that the proper test is the Bergeron "heavy burden" test and that it was error for the trial judge to not consider it before concluding that it was in the best interest of the child to award custody to a non-parent. According to Bergeron, 492 So.2d 1193,1200 (La.1986), "When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child."
We find that the Bergeron standard does not apply to our set of facts because the Kroics were not parties to the original custody dispute. In making this holding, we recognize that the Louisiana Supreme Court's rationale behind establishing the heavy burden in Bergeron was to avoid subjecting children to the emotional harm that is caused by "erroneous judgment, unjustified litigation, threat of litigation, or continued interparental conflict." Id. (Emphasis added.) Nor is Geen, 666 So.2d 1192, applicable to the instant case, as it is uniquely distinguishable on its facts.
The proper standard to apply in this case is that set out in La.Civ.Code art. 133, which provides that if an award of custody to a parent "would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment...." (Emphasis added), as expounded upon in Love v. Love, 536 So.2d 1278 (La. App. 3 Cir.1988), which set out the two-fold burden for a non-parent to prevail against a parent in a custody action. Namely, in order to divest a parent of custody, this court held that the non-parent has to show that custody to the parent would be detrimental to the child and that a custody award to a non-parent is in the child's best interest. Id. Post-Love cases have used the term "detrimental" interchangeably with the term "substantial harm." Robert v. Gaudet, 96-2506 (La.App. 1 Cir. 3/27/97); 691 So.2d 780.

AWARD TO A NON-PARENT
Before applying La.Civ.Code art. 133, we make a threshold determination that the death of Michael Thomas' father serves as a material change, affecting his welfare, compounded by the fact that Michael was the primary caretaker. Thus, in order to prevail, the Kroics must show that an award of custody to Sharon would result in substantial harm and that it would be in Michael Thomas' best interest to be placed in their custody.

*1305 Substantial Harm

We first determine whether continued parental custody would result in "substantial harm" to the child in this case. The non-parent must prove the "substantial harm" by clear and convincing evidence. Creed v. Creed, 94-268 (La.App. 3 Cir. 12/21/94); 647 So.2d 1362.
In a custody contest between a non-parent and a parent, the child should remain, when possible, in the natural parent's custody "to maintain family unity and help the child identify [himself or herself] as part of the natural family unit." State, in Interest of Sylvester, 525 So.2d 604, 607 (La.App. 3 Cir. 1988). However, we see little positive for the child to identify with in the instant case and much to negatively influence him. Presently, Sharon lives in a house with her second child, who is illegitimate, and Sharon's mother, brother, sister, and her sister's two children. Sharon's sister is also an illegitimate child, and at the age of nineteen, has two illegitimate children of her own, from two different fathers. Her brother was recently released from house arrest. In fact, the record indicates that almost all of the people in that household have been convicted of drug violations. For example, while pregnant with Michael Thomas, Sharon was charged with, and later convicted of, possession with intent to distribute marijuana. She was also looking for drugs before Michael's death. Sharon's brother was convicted of distribution of marijuana and possession of a firearm by a convicted felon. Her mother was convicted of possession of drug paraphernalia. Lastly, Sharon's companion, who often visited the house, was being prosecuted for drug-related offenses at the time of the hearing. Clearly, we find evidence of a detrimental pattern that should not be given the potential to repeat itself.
Further, the record provides ample proof that Sharon abandoned and emotionally ignored her child and that love, affection, and a parental bond were lacking: After her divorce, she saw the child once or twice a month, although she lived twenty to twenty-five minutes from him. Before Sharon moved to Texas at the end of 1994, she saw him once or twice, and prior to the death of the natural father, she saw her child sporadically. On one occasion before Michael's death, Sharon asked Michael to come and take their son home, shortly after she just picked him up, because she could not take care of both Michael Thomas and her other child. According to Karen Alexander, whom Michael was living with, "She was supposed to see him every other weekend and the usual joint custody thing. But she was never there to get him when she was supposed to be. And if you tried to track her down, she was kind of hard to find, you know." Alexander also testified that "She would say she's coming to pick him up and not show up at all. Or we could call her ... and she wouldn't take him." When questioned about her son at trial, she did not even know his birthday, giving three different dates. Further, Sharon never thought to check on the child's progress in school, did not know whether he was in school, what grade or school he was in, his teacher's name, what size he wore, the names of his friends, his religious affiliation, or about his health. The Kroics even had to obtain the child's birth certificate and shot records from her in order to enroll him in school. Acutely telling was Sharon's behavior after what must have been an extraordinarily traumatic event for her sonhis father's death. Immediately afterwards, Sharon visited her son at Michael's residence, but did not take the child home with her, leaving him in the care of Michael's family members. Additionally, she made perhaps one attempt to contact John since the child has been with him. She also admitted to not "know[ing] anything about his health" and did not even call to speak to the child on his birthday, Thanksgiving, Christmas, New Year's, or on school breaks. Sharon's lack of effort is further delineated in her excuse for not knowing more about her son: "Because they don't tell me anything."
As for the pictures admitted into evidence, illustrating Michael Thomas' diaper rash which frequently surfaced while he was a one-year-old in his mother's care, we cannot automatically conclude that the rash constituted neglect without having medical or expert testimony before us to establish its severity. *1306 However, based on our other findings, there is sufficient evidence to prove that placing Michael Thomas in the care of his natural mother would be substantially harmful to the child.

Best Interest of the Child
According to comment(a) of La.Civ. Code art. 131, the best interest consideration applies to all custody awards. We agree with the trial court that the "primary concern is the welfare, well-being, stability of the child." The court shall consider all relevant factors in determining what is in the child's best interest. Such factors may include those set out in La.Civ.Code art. 134:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other medical needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
According to Gautreau v. Gautreau, 96-1548 (La.App. 3 Cir. 6/18/97); 697 So.2d 1339, 1345, these factors are "very wide ranging and encompass all aspects of a child's life. This includes not only physical well being, but also the overall emotional well being of the children." We find that the Kroics are able to meet his physical and emotional needs and agree with the trial judge that factors two, three, four, six and twelve are clearly present in this case. The Kroics enrolled him in school, monitored his educational progress, gave him medical attention, exposed him to religion, and most important, provided a stable, loving environment for him. John and Pamela have been married for twelve years, have high school diplomas and vocational technical education, and have had stable employment since that time. In addition, they have lived in the same community their whole lives and have no prior criminal convictions. Moreover, Pamela stated the following at trial: "I love him with all my heart just like he's my own" and "[H]e loves me very much .... he tells me all the time."
The extent of the Kroics' participation in Michael Thomas' life is undeniable. They have been with him on every birthday and have obviously taken a sincere interest in him, unlike his own mother who seems to have made him and his welfare a low priority, if one at all. Little can be said of her emotional ties to himof her love and affection. On the other hand, the Kroics know everything about him, down to his exact pant, shirt, and shoe size. They can even recite the dates and purposes of his last doctor visits. Further, Michael Thomas' report card suggests that he has progressed well since living with his aunt and uncle. Based on the above, we have no doubt that the Kroics would continue to give Michael Thomas the love and support that he needs to cope with his father's death and to experience some sense of direction in his life.
As for Sharon's argument that she should become the sole custodial parent since Michael died, we find no authority to support her contention that the surviving parent in a *1307 considered decree automatically becomes the sole custodial parent.
After a thorough review of the record, we conclude that the trial court did not clearly abuse its discretion in awarding custody to John and Pamela Kroics, non-parents, rather than to Sharon Kroics, a parent. The Kroics proved by clear and convincing evidence that placing Michael Thomas in Sharon's custody would result in substantial harm and that it is in Michael Thomas' best interest to have his needs met by them.

CONCLUSION
Based on the foregoing, we affirm the decision of the trial court. Costs of this appeal are to be cast to Sharon Kroics.
AFFIRMED.
AMY, J., concurs in the result.